# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| D.C., an individual, | Case No.: 2:26-cv-00425-ALM-KAJ |
| Plaintiff, | JUDGE: |
| v. | MAGISTRATE JUDGE: |
| CHOICE HOTELS INTERNATIONAL, INC.; JAI MATA DI, LLC, A CONNECTICUT LIMITED LIABILITY COMPANY, THREE JUDGES MOTEL LLC, A CONNECTICUT LIMITED LIABILITY COMPANY; MANI ENTERPRISES INC, A CONNECTICUT CORPORATION; C&A HOSPITALITY, LLC, A CONNECTICUT LIMITED LIABILITY COMPANY, | Demand for Jury Trial |
| DOES 1-10, | |
| Defendants | |

## FIRST AMENDED COMPLAINT FOR DAMAGES

### INTRODUCTION

1. Plaintiff, D.C., an individual, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2015 through 2017, when she was 16 through 18 years of age. For years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

2. Plaintiff was trafficked in a hotel owned, operated, and managed by Defendants Choice Hotels International, Inc., Jai Mata Di, LLC, a Connecticut limited liability company, Three Judges Motel LLC, a Connecticut limited liability company, Mani Enterprises Inc, a Connecticut Corporation, and C&A Hospitality, LLC, a Connecticut limited liability company. Plaintiff's traffickers rented hotel rooms for the purpose of engaging in sex trafficking.

3. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

### PARTIES

4. Plaintiff is a natural person, currently 27 years of age, who is a resident and citizen of New Haven, Connecticut.

5. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed

2

under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

6.   Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[4]

7.   Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

8.   Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

9.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); Doe v. Stegall, 653 F.2d at 186 (5th Cir.); see also *Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXIII*, 214 F.3d at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

10. Defendant Choice Hotels International, Inc. ("Choice") is one of the largest hotel franchising companies in the world, with over 7,000 branded properties in more than forty (40) countries and territories. It is a Delaware corporation. Choice does business in a systematic and continuous manner throughout Ohio, including this District and Division.

11. Jai Mata Di, LLC is a Connecticut limited liability company. It owned and operated the Econo Lodge Motel at 370 Highland St, West Haven CT, during the time that the Plaintiff was trafficked.

12. Three Judges Motel LLC is a Connecticut limited liability company. It owned and operated the Three Judges Motel at 1560 Whalley Ave, New Haven, CT, during the time that the Plaintiff was trafficked.

13. Mani Enterprises Inc. is a Connecticut Corporation. It owned and operated the Regal Inn at 1605 Whalley, Ave, New Haven, CT, during the time that the Plaintiff was trafficked.

14. C&A Hospitality, LLC is a Connecticut limited liability company. It owned and operated the New Haven Inn at 100 Pond Lily Ave. West Haven, CT, during the time that the Plaintiff was trafficked.

15. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the principals and members of the named defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

4

**JURISDICTION AND VENUE**

16. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and because the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

**SEX TRAFFICKING OVERVIEW**

18. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

19. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

20. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

21. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

22. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by

5

846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

23. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

24. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

25. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

26. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

27. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of

6

their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

28. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

29. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

30. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

31. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

32. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline

involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

33. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

34. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others,  have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay— from check-in to check-out—traffickers and victims display recognizable warning signs.

35. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

36. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

37. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

38. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

39. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

### Plaintiff was Trafficked

40. Plaintiff's trafficking began in 2015, when she was just 16 years old.  Plaintiff met her trafficker, "D", an older adult male, while experiencing housing instability and in need of a job.[6] Together with his trafficking associate, "S", an older adult female, he used manipulation and coercion to force Plaintiff to engage in commercial sex for the traffickers' financial benefit.

41. Her traffickers would post ads online on Backpage.com, advertising sex services under various aliases, including "S", "E", and sometimes "J". Using those identities, her trafficker created online commercial sex advertisements. These advertisements included photographs of Plaintiff.

42. Through the Backpage.com platform, "D" and "S" were able to manage bookings, screen buyers, maintain branding, and sustain high-volume operations. Plaintiff was repeatedly

---

[6] To protect Plaintiff's identity, she will disclose her identity and that of her trafficker once the Court enters a True Identity Protective Order.

sent to hotels throughout the Connecticut area, where she met buyers in rooms arranged by her traffickers. She was transported to the locations, placed in rooms, and required to meet adult men alone. She was often left waiting in hotel rooms for extended periods

43. The hotels included the following locations:

    a. Econo Lodge Motel at 370 Highland St, West Haven CT;

    b. Three Judges Motel at 1560 Whalley Ave, New Haven, CT;

    c. Regal Inn at 1605 Whalley, Ave, New Haven, CT; and

    d. New Haven Inn at 100 Pond Lily Ave. West Haven, CT;

44. Her traffickers exploited Plaintiff's age, vulnerability and unprotected status to coerce her into performing sex acts with adult men. Plaintiff's trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the hotels, including effects on Plaintiff's appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that Plaintiff was being continually subjected to coercion, control, and exploitation.

45. At each of these locations, there were overt and obvious signs of Plaintiff's trafficking, including Plaintiff's presentation. She appeared fatigued, anxious, and withdrawn. She often had visible poor hygiene, few possessions, dysregulated behavior in the parking lot, and public areas.

46. Her trafficker's patterns and practices of booking also revealed the trafficking –rotating through hotels, extending or ending bookings with no notice, paying in cash, asking housekeeping for extra towels, loitering outside the hotel room, and conducting transactions.

47. Over time, the conditions escalated. Substance dependency deepened, and the volume and pace of the activity remained demanding and relentless. Plaintiff experienced homelessness. By late 2017, Plaintiff was able to escape her traffickers.

48. As a direct result of being exploited as a minor and young adult, Plaintiff suffered significant and lasting psychological, emotional, and relational harm. The long-term effects

of her exploitation continue to impact her in profound and ongoing ways, and she continues to struggle with many of the same struggles she encountered during her period of trafficking.

**Sex Trafficking at Choice Hotels**

49. For years, Defendant Choice has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking, which tragically occurs on its hotel properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff at the hotel brands owned by Choice Hotels. For example:

   a. On November 10, 2009, a young child was raped and killed at a Comfort Inn, which is a Choice-branded hotel, in Fayetteville, North Carolina.[7] The incident caused such outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in its hotels.[8] It was only after this horrific incident that Defendant Choice started to publicize a need for change.

   b. In December of 2009, authorities found a man was attempting to use a Comfort Suites in Orlando, Florida, to sex traffic a fifteen-year-old girl. He was arrested when the fifteen-year-old girl ran into a store to contact authorities.[9]

   c. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[10] However, Defendant Choice did not enforce the program, or require

---

[7] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

[8] *See* Change.org Petition, *Tell Choice Hotels To Prevent Child Prostitution In Their Hotels*, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels (last visited Mar. 4, 2019).

[9] *Cops: Man Tried to Sell Girl, 15, for Sex,* The Orlando Sentinel, Dec. 23, 2009.

[10] *See* Choice Hotels*, Human Rights Policy*, available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 4, 2019); *see also* ECPAT-USA, *Tourism Protection Code of Conduct*, available at http://www.ecpatusa.org/code/ (last visited Mar. 4, 2019).

its employees to complete this training, or even follow up to make sure the hotels were following the protocols.[11]

d. In May of 2012, two men were charged with promoting prostitution and engaging in prostitution inside of a Comfort Suites hotel room in Asbury Park, New Jersey.[12]

e. In 2012, an anti-trafficking coalition alerted Defendant Choice of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[13]

50. Additionally, Defendant Choice has been aware of sex trafficking and guest safety issues at its branded properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews show the pervasiveness of customer reported sex trafficking and guest safety issues on Choice-branded properties and Defendant Choice's inattentiveness, for example

a. In April of 2011, a female escort was choked and robbed by three men in a Choice branded Quality Inn hotel room in Plantation, Florida.[14]

b. In February of 2012, a fourteen-year-old girl was found at a Choice branded Quality Inn in Oakland, Pennsylvania after missing for a year when authorities set up a sting operation into internet advertisement.[15]

c. In March of 2012, two men were arrested for sex trafficking two minors at a Choice branded Quality Inn hotel in Houston, Texas.[16]

d. In November 2012, two women and one man were arrested at a Choice branded Quality Inn in Boca Raton, Florida after authorities were seeking to crack down on human trafficking.[17]

---

[11] *See* Choice Hotels, *Human Rights Policy, supra,* n.30.

[12] 2 Men Charged with Prostitution, Asbury Park Press, May 19, 2012, at pg B3.

[13] *See* Christian Brothers Investment Services, London Olympics Report Release, *available at* https://cbisonline.com/us/london-olympics-report-release/.

[14] *Escorts Target of Spree*, The Miami Herald, Jun. 06, 2011, at pg 20.

[15] *Missing Teen Found During Prostitution Bust*, Pittsburgh Post-Gazette, Feb. 12,2012, at pg 12.

[16] *Two Men Accused of Child Sex Violations Await Trials*, The Odessa American, Apr. 14, 2012, at pg A1 and A4.

[17] *Police Arrest 16 in Prostitution Sting*, The Palm Beach Post, Nov. 23, 2012, at pg B010.

e. In November of 2012, a reviewer described a Choice branded Quality Inn in Jacksonville, Florida as follows: "As we pull up we have a perfect first impression of one of the local " working " girls heading out to make a buck off a tractor trailer driver. The room had dirty towels on the floor in the corner but the staff was great."[18]

**Actual and Constructive Knowledge**

51. At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises, followed well-established patterns, and presented with obvious indicators that defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

52. Upon information and belief, Plaintiff's traffickers repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the hotels.

53. Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

54. During the period that Plaintiff was trafficked at each of these hotel properties, there were obvious signs that her trafficker was engaged in sex trafficking:

a. Plaintiff's trafficker or a John would pay for the room with cash or prepaid credit cards.

---

[18] Review of Comfort Suites  Orange Park Jacksonville, *available at* https://www.orbitz.com/Jacksonville-Hotels-Quality-Inn-Orange-Park-Jacksonville.h10686.Hotel-Information

b. Plaintiff would appear to be with a significantly older "boyfriend" and have lower quality clothing compared to males she was with.

c. At check in, the hotel staff observed Plaintiff exhibit evidence of being verbally threatened and emotional abuse.

d. Plaintiff's trafficker would reserve multiple rooms.

e. Plaintiff would have few or no personal items when checking in.

f. Plaintiff would often be dropped off at the hotel by her trafficker.

g. Plaintiff could be seen loitering on property and appearing to monitor the area.

h. Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.

i. After Plaintiff checked out, hotel cleaning staff noticed large amounts of sex paraphernalia like condoms and lubricant in the trash.

j. Plaintiff prevented housekeeping staff from entering the room for regular cleaning.

55. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

56. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

57. As such, the defendants knew or was willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

58. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

59. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

60. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

61. The hotel staff and the franchisees also facilitated widespread trafficking at the properties, including the trafficking of Plaintiff in ways including, on information and belief:

   a. developing a relationship with Plaintiff's trafficker, and creating an understanding that she could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

   c. accommodating specific requests made by trafficker;

   d. serving as lookouts for trafficker;

   e. accepting bribes from the trafficker;

   f. observing Plaintiff in obvious distress but continuing to provide support to her trafficker;

   g. allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

   h. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   i. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   j. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities, but, instead, could operate without concern for detection or interference by the hotel staff;

   k. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff

62. The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

63. The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Choice Hotels Franchisor and Franchisee Relationship**

64. Choice was in a franchisor-franchisee and agency relationship with Defendant Jai Mata Di, LLC offering public lodging services at the Econo Lodge Motel at 370 Highland St, West Haven CT. This agency relationship was established through Defendant Choice's exercise of an ongoing and systemic right of control over the Econo Lodge hotels by Defendant Choice's operations, including the means and methods of how Econo Lodges conducted daily business through one or more of the following actions:

   a.  providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with Choice;

   b. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

   c. providing new hire orientation on human rights and corporate responsibility;

   d. providing training and education to Econo Lodge branded hotels through webinars, seminars, conferences, and online portals;

   e. providing and controlling customer review and response platforms;

   f. hosting online bookings on Defendant Choice's domain;

   g. requiring Econo Lodge branded hotels to use Defendant Choice's customer rewards program;

   h. requiring Econo Lodge branded hotels to use Defendant Choice's property management software;

   i. requiring Econo Lodge branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

   j. providing IT support for all property management systems, owned, operated and required by Choice;

   k. setting employee wages;

l.  making employment decisions;

m.  advertising for employment;

n.  sharing profits;

o.  requiring Econo Lodge branded hotels to use Defendant Choice's property management software;

p.  requiring Econo Lodge branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

q.  providing IT support for all property management systems, owned, operated and required by Choice;

r.  standardized training methods for employees;

s.  building and maintaining the facility in a manner specified by the owner;

t.  standardized or strict rules of operation;

u.  regular inspection of the facility and operation by owner;

v.  fixing prices; or

w.  other actions that deprive Comfort Suites and Quality Inn ® branded hotels of independence in business operations

65. An apparent agency also exists between Defendant Choice and Defendant Jai Mata Di, LLC to the public as possessing authority to act on its behalf. Defendant Choice clothed its franchisee with apparent authority to act for Defendant Choice in the following ways: by requiring the use of Choice signs, providing Choice branded stationery, requiring the use of Choice's website and Choice's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Choice guest rewards programs. On information and belief, Defendant Choice's conduct reasonably led Plaintiff's trafficker to believe that Jai Mata Di's Econo Lodge had the authority it purported to have, and Plaintiff was injured as a result.

66. As the principal, Choice controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Econo Lodge where Plaintiff was trafficked.

67. Econo Lodge's website is hosted at Choice's domain www.choicehotels.com.

68. When staying at Econo Lodge branded hotels, guests receive Choice Privileges® (Choice rewards) for bookings.

69. Defendant Choice exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Econo Lodge where plaintiff was trafficked for sex.

70. Defendant Choice exercises day-to-day control over the Econo Lodge, as well as its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including this hotel, through its brand standards and retains control over the Econo Lodge through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

71. Choice makes decisions that directly impact the operations and maintenance of their branded hotels, including at this hotel.

72. Choice is the principal in an agency relationship with Jai Mata Di, LLC. In addition to Choice's liability under TVPRA section 1595, Choice is vicariously liable for the acts and/or omissions of the staff at its Econo Lodge.

73. In addition to an actual agency relationship, Defendant Choice has ratified the actions and inactions of Defendant Jai Mata Di, LLC.

74. Defendant Choice and Defendant Jai Mata Di, LLC are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Econo Lodge where the Plaintiff was trafficked for sex. Defendant Choice and Defendant Jai Mata Di, LLC each share the common policies and practices complained of herein.

75. Defendant Choice and Defendant Jai Mata Di, LLC jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

76. As an integrated enterprise and/or joint employer, Defendant Choice and Defendant Jai Mata Di, LLC are separately and jointly responsible for compliance with all applicable laws.

77. As an integrated enterprise and/or joint employer, Defendant Choice and Defendant Jai Mata Di, LLC are jointly and severally liable for any damages caused by their employees.

18

78. Defendant Choice and Defendant Jai Mata Di, LLC are considered employers under federal labor regulations.

79. Upon information and belief, Choice controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Econo Lodge where Plaintiff was trafficked.

80. At all relevant times, Defendant Choice and Jai Mata Di, LLC were involved in the staffing and operation of the Econo Lodge where Plaintiff was trafficked for sex. Defendant Jai Mata Di, LLC managed the hotel pursuant to a franchise agreement with Defendant Choice. Directly and through its franchise agreement with Defendant Choice, Defendant Jai Mata Di, LLC directly offered public lodging services at the Econo Lodge where Plaintiff was trafficked for sex.

81. As hotel owner, Defendant Jai Mata Di, LLC participated in a hotel operating venture that included hotel staff and employees who were closely involved with the daily management and operations of the hotel pursuant to Defendant Choice's brand standards, franchise agreements, licensing agreements, and operating agreements.

82. At all relevant times, Defendant Choice managed, supervised, directed, and/or operated the Econo Lodge through its brand standards, franchise agreement, and franchise disclosure documents. Because Choice operated the Econo Lodge where Plaintiff was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals Plaintiff was victimized in.

83. Defendants participated in a hotel operating venture in connection with the management and operation of the Econo Lodge involving risk and potential profit.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 USC 1595 (against all defendants).

84. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

85. Thus, the federal sex trafficking statute consists of four elements: (a) the defendants(s) knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant(s) knew or should have known the venture violated the sex trafficking statute.

**Claim 1: Choice and Jai Mata Di, LLC Liability**

**Knowingly Benefited**

86. Choice and Jai Mata Di LLC knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

87. Choice and Jai Mata Di LLC fully participated in the commercial venture of renting rooms to plaintiff's traffickers.

88. Moreover, Choice was involved in a business venture with Jai Mata Di LLC to operate a hotel and rent rooms.

20

**The Venture Violated the TVPRA.**

89. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

90. Defendants were well aware of the prevalence of sex trafficking generally at their hotel, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

91. Choice exercise of day-to-day control over the Wyndham property in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisee.

**Claim 2: Mani Enterprises Inc Liability**

**Knowingly Benefited**

92. Mani Enterprises Inc. knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

93. Mani Enterprises Inc fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

**The Venture Violated the TVPRA.**

94. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

21

**Actual or Constructive Knowledge.**

95.     Mani Enterprises Inc was aware of the prevalence of sex trafficking generally at its hotel, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted them to Plaintiff's situation, gave the Defendant constructive knowledge of the sex trafficking of Plaintiff.

**Claim 3: C&A Hospitality, LLC Liability**

**Knowingly Benefited**

96. C&A Hospitality, LLC knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

97. C&A Hospitality, LLC fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

**The Venture Violated the TVPRA.**

98. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

99. C&A Hospitality, LLC was well aware of the prevalence of sex trafficking generally at their hotel, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Claim 4: Three Judges Motel LLC Liability**

**Knowingly Benefited**

100. Three Judges Motel knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

101. Three Judges Motel participated in the commercial venture of renting rooms to plaintiff's traffickers.

**The Venture Violated the TVPRA.**

102. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

103. Defendant Three Judges Motel was well aware of the prevalence of sex trafficking generally at their hotel but, nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.


## SECOND CAUSE OF ACTION: CAVRA

Child Abuse Victims Rights Act ("CAVRA")

18 USC 2255 (against all defendants)


104. Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

105. Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

106. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

**THIRD CAUSE OF ACTION: NEGLIGENCE**

(against all defendants)

107. These defendants have a heightened duty of care to invitees, such as Plaintiff, who stay at their hotels.

108. As alleged above, sex trafficking was a reasonably foreseeable occurrence at the defendants' hotels from their knowledge and past experiences that persons on the premises would suffer serious bodily harm as a result of being victimized by crimes perpetrated by third parties on the premises, and that they should have known for more than a decade that sex trafficking runs rampant at their motels.

109. Additionally, the franchisors are vicariously liable for the negligence of its agents and franchisees.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

<div style="margin-left: 50%;">

By: /s/ *Penny L. Barrick*
Penny L. Barrick, (0074110)
Steven C. Babin, Jr. (0093584)
**Babin Law, LLC**
10 W Broad Street
Suite 900
Columbus, Ohio 43215
Phone: 614.761.8800
Direct: 614.372.6404
Cell: 614.747.6184
Fax: 614.706.1775
penny.barrick@babinlaws.com
steven.babin@babinlaws.com

</div>